UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 14-cr-00042-01

VERSUS                            JUDGE STAGG

DONZELL JOSEPH SAMUELS, JR.        MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Before the court is Defendant's **Motion to Suppress (Doc. 19)**.  An evidentiary hearing was held on July 14, 2014.  For the reasons that follow, it is recommended that Defendant's motion be **denied**.

**Facts**

The testimony at the hearing establishes the following facts.  ATF Task Force Agent Jeffrey Brown received information from a reliable source that "Cowboy," who resided at 6543 West Canal in Shreveport, was in possession of a firearm and "POLICE" T-shirts, and he was involved in home invasions and other illegal activities. Tr. 6. The source confirmed to Brown that Cowboy had previously resided in the Queensborough neighborhood on Catherine Street and that Cowboy's mother still lived on Catherine Street. Tr. 6.

Brown has 16 years of law enforcement experience as a commissioned Shreveport Police Officer.  He has a federal ATF law enforcement commission and also is commissioned a Caddo Parish Sheriff's Deputy.  He knew that Defendant, Donzell Joseph Samuels, Jr.,

used the alias "Cowboy" and had lived on Catherine Street.  He also knew that Samuels had at least one prior felony conviction.  Brown later confirmed that Samuels had three felony convictions in the First Judicial District Court in Caddo Parish: one for burglary of an inhabited dwelling; another for possession of a Schedule II controlled dangerous substance; and a third for accessory after the fact to manslaughter.  Tr. 6-7.

Brown contacted Caddo Sheriff's Deputy Kameelah Howard of the Caddo Parish Sheriff's Office Probation Department.  Howard has been a deputy for seven years and worked in the Sheriff's Department misdemeanor probation office for approximately two years.  Howard told Brown that Samuels was on misdemeanor probation.  Howard confirmed that Samuels' residential address was 6543 West Canal in Shreveport; that was the address Samuels gave to Howard and that was on a signed probation department document.  Ex. G-1; Tr. 63.

Brown told Howard that he had received information that Samuels possessed a firearm and other items at his residence on West Canal and had been involved in home invasions. Howard told Brown that the probation office had not made personal contact with Samuels at his residence since he was placed on probation, but she would check with her supervisors. She did, and her supervisor instructed her to conduct a home visit.  Tr. 65-67.  Howard then contacted Brown and told him she planned to "go out and check," and she asked Brown to accompany her and the other officers to assist in the event any firearms were found.  Tr. 66. Howard had never conducted a home visit before and was not sure what to do if firearms were found.  CPSO Sgt. Mike Middleton also assisted.  Tr. 66-67.

The plan was to determine if Samuels was home, then make contact with him.  Tr. 67.
Brown drove by 6543 West Canal and saw Samuels outside the residence. It appeared that
Samuels entered the residence through a side door.  Tr. 10-11.  Howard was so advised.  A
few minutes later, Howard, Middleton, and several other deputies from the probation office,
approached the residence.  There were two entrances.  Some deputies went to the front door.
Howard, Middleton, and another deputy went to the side or kitchen door.  The deputies were
dressed in Sheriff's Department uniforms.  Howard was a wearing protective vest under her
uniform shirt.  Middleton wore one over his uniform, but it was well marked.  No weapons
were drawn, and no force was used at any time.

Howard knocked on the building at the side door to the kitchen , which had a screen
door with decorative metal burglar bars on it. Ex. 6A.  The solid door behind the screen door
opened and the deputies were greeted by Zeshauntel Taglieri, who resided at the residence
and was then believed to be Samuels' girlfriend.  Tr. 69. It was later determined that she was
Samuels' wife.

Through the screen door, Howard told Taglieri who she was and that she was there
to check on Donzell.  Taglieri hollered to the back, "Cowboy, your probation officer is here."
Samuels replied, "I'm coming," Tr. 71.  Howard testified, "And that's when we asked if we
could come in and she said yes, and we opened the door and stepped into the threshold just
right into the door." Tr. 70.

Middleton's testimony about entry into the residence was somewhat inconsistent with
Howard's testimony.  Middleton said Taglieri opened the door and left it open as she called

for "Cowboy," and when Middleton heard "Cowboy" coming from the back of the house, he moved to a tactical position for officer safety.  Tr. 109.  Middleton also said that he didn't remember specifically what Taglieri said about entering the house.  Tr. 110.  He stated that he probably asked Taglieri to open the screen/wrought iron door since he could not see her.  Tr. 120-121.  He stated that she cooperated and allowed entry.

Samuels came out of a room at the end of the hall and walked up the hallway into the living room area.  When Samuels saw Howard (a female), Samuels said, "I need to put on some clothes," because he was not wearing pants.  Tr. 71 and 108-110.  For officer safety, Middleton then walked with Samuels back to the second bedroom to the right so Samuels could get dressed.  Tr. 71.

The door to the bedroom had a hook that said "Cowboy" on it.  Howard remained in the kitchen area while Middleton accompanied Samuels to the bedroom.  After Samuels put on pants, Howard went back to the bedroom.  Samuels was looking through some drawers for a T-shirt to put on, but then said he didn't need a shirt.  Then Samuels, Howard, and Middleton walked to the kitchen and living area.  Tr. 72-73.  No search was made at this time. Tr. 71-72.

When Samuels came into the front kitchen and living area, Howard told Samuels she and the deputies were present for a probation visit because Howard had learned that he had a gun in the home.  Samuels said he did not have a gun.  Tr. 73.  At about this time, Brown arrived and patted down Samuels for officer safety.  Tr. 73.   Brown felt and heard plastic packaging in Samuels' pocket that Brown immediately recognized to be packaging for drugs.

When asked about this, Samuels replied that it was a little weed. (He called it his "high package".) Tr. 109. This baggie was removed from Samuels' pocket and placed on the table. It was found to contain marijuana and powder cocaine. Samuels was then arrested, advised of his *Miranda* rights, and handcuffed. Howard testified that Samuels appeared to understand his rights and waived those rights to answer Brown's questions. Tr. 16-17, 73-74.

Brown asked Samuels if there was a gun in the home. Samuels replied that his girlfriend might have one in the back of the house. Tr. 16 and Tr. 74. Brown then asked Samuels where the gun was and if he could retrieve it. Samuels stated that he did not know where the gun was. Tr. 19-20. When asked if there was anything else in the house such as firearms or narcotics, Samuels responded that there was not. Tr. 21 and 22. Brown asked Samuels if he could search for it and Samuels said, "Go Ahead." Tr. 22.

Brown then asked Taglieri (as it turns out, the house was in her name) if the deputies could search the house. She said, "Yes," and then Middleton produced a Sheriff's Department consent to search form. Howard read the consent form to Taglieri, who signed the consent form. Ex. G-2; Tr. 18, 75-77.

As Taglieri completed and signed the form, Brown asked her if there were any firearms inside the residence. Taglieri asked Brown what Samuels had said about that. Brown replied that Samuels said that she had a firearm in the residence. Taglieri stated she did not own a firearm, but that Samuels kept a silver one under the mattress. Tr. 23-24. Brown entered the residence again, walked into the southwest bedroom where Samuels had exited when the deputies arrived, lifted the mattress and located a loaded silver .380 Colt

Page 5 of  15

pistol.  Brown went back to the kitchen and told Samuels that he had found the pistol.  Brown asked Samuels if there was anything else in the residence that police should know about.  Samuels said there was not.  Brown then asked Samuels if the police could search the house.  Samuels again stated, "Go ahead."   Samuels told Brown that Brown had already found whatever he was going to find (referring to the .380).  Tr. 24-25.

Brown found a letter in the bedroom addressed to Samuels at that address.  Also found in the bedroom were a duffle bag containing digital scales, drug packaging material for distribution, a firearm, and assorted firearm ammunition.  Tr. 26-27.   Two backpacks containing duct tape, rubber gloves, binoculars, a green "Incredible Hulk" face mask, two black T-shirts with "POLICE" printed on them in large white letters, and ear plugs were located in the closet of the southeast bedroom.  Tr. 27-28.  One of the backpacks contained the Louisiana driver's license of a male and a female who lived on a nearby street. Brown recognized the names of the people as victims of a home invasion robbery months earlier.  Tr. 28.

Brown contacted a detective with the Shreveport Police Department's Armed Robbery Unit who recalled the home invasion and that one of the suspects was wearing a green mask.  Brown told the detective that one of the backpacks contained a green "Incredible Hulk" mask along with the victims' driver's licenses.

Officers also found a locked safe in a hallway closet.  Several holes were in the bottom of the safe, which was designed to be bolted to a surface for security.  By looking

through these holes, Brown saw at least one handgun inside the safe.  The safe was seized, and a state search warrant was obtained to open and search it.  Tr. 29-30; Ex. G-5.

The safe contained a Smith & Wesson revolver, Model 66, caliber .357, loaded with six rounds of .357 ammunition in the cylinder; a Taurus pistol, Model PT809, caliber 9mm with nineteen (19) rounds of 9mm ammunition in the magazine and the chamber; a Ruger pistol, Model P95, caliber 9mm with fifteen (15) rounds of 9mm ammunition in the magazine and chamber; sixteen rounds of 9mm ammunition in an extended 9mm magazine; thirty-three rounds of .22 caliber ammunition; one round of .380 ammunition; and one round of 9mm ammunition.

Samuels was told that he was being arrested for possession of a firearm by a convicted felon and illegal carrying of weapons since he was also in possession of drugs.  Samuels said that he had a cocaine problem for a long time.  When asked about the .380 found under the mattress, Samuels admitted that it was his, but he said he did not do anything with it.  Tr. 31-32.  Samuels stated that he knew he could get ten years for it, so he asked that it not be a federal case.  Brown told him that this case would be an ATF case.  Samuels was then transported to Caddo Correctional Center for booking on various state charges and violation of his probation.  Tr. 32-34.

After Samuels was removed from the house, Brown asked Taglieri for her consent to search the areas of the house that had not yet been searched.   Taglieri orally consented and signed a second consent to search form.  Ex. G-3; Tr. 34-36.  Taglieri said that if anything else was found, she did not know about it.  In the hallway, Brown saw a pull down attic door

with a string attached.  He pulled the attic stairs down and walked up the steps into the attic.

At the top of the stairs, he found a 16-gauge shotgun and a police scanner.  In the kitchen

cabinets, Brown found a large plastic bag that contained a magazine for a shotgun, boxes of

ammunition, and a digital scale.  All items were photographed and seized.  Ex. G-4; Tr. 37-

38.

Brown asked Taglieri about her knowledge of the items found during the search.

Taglieri stated that she had been dating Samuels for some time; they had lived at the

residence for four months; Samuels had a cocaine problem and did not work; she worked to

pay the bills while he sat home and had his friends over to "do whatever it is that they do."

She said that she was unaware of the items in the closet and in the attic. She knew Samuels

had the one gun that was located under the mattress because Samuels carried it with him.

She knew the safe was in the closet, but he never told her what was in it or why it was there.

She said that she did not have access to the safe as far as having the code or a key to it.  Tr.

38-39.

When Samuels was placed on probation on June 26, 2013, he met with Howard to

review the conditions of his probation and to sign the Sheriff's Department conditions of

probation form.  Ex. G-1; Tr. 62-63.  On that document were Samuels' fingerprints, his

signature and written conditions of probation.   Tr. 63-64.   Howard testified that she

personally reviewed this form with Samuels to confirm that the information Samuels gave

was correct and that Samuels understood his conditions of probation.  Tr. 64.  The conditions

listed on the form included that Samuels refrain from criminal conduct, specifically the violation of any state, federal, local or municipal law.  Other conditions were that he refrain from owning or possessing firearms or other dangerous weapons, that he was subject to arrest with or without a warrant for the purpose of returning him to court, and that he permits the Probation Officer to visit him at home or elsewhere.

Howard also testified that, in addition to the written conditions on the form, she told Samuels that he was subject to other conditions that she called Article 895 conditions. She testified that she orally informed Samuels of those conditions.  Howard testified that she personally told Samuels of the condition in section (A)(13)(a) of Article 895 that by signing the form he was consenting to his probation officer's ability to search his home as a condition of probation.  Howard testified that went over that issue with Samuels and that she did so with all of the people under her supervision. Tr. 101.  She further testified that when she talked about Condition 4 on the form which was "Permit the probation officer to visit your home or elsewhere," she told Samuels specifically that it was more than just a visit, it was to visit and search.  Tr. 102.  Samuels signed the form acknowledging he understood and agreed to the conditions. Tr. 62-63, 101-102.

**Defendant's Motion to Suppress**

Samuels argues that Brown's entry into his residence – after enlisting the aid of a probation officer – was unconstitutional as it was done as a subterfuge for the purpose of furthering a criminal investigation.  Samuels notes that the probation form that he signed contained a provision whereby he agreed to "home visits" by his probation officer, but not

a warrantless search of his person or residence.  Samuels also argues that any consent (from him or Taglieri) or any of his statements that may have been obtained or made after the officers entered the residence was not free and voluntary, but is "fruit of the poisonous tree."

**Law and Analysis**

States have a reasonable interest in ensuring that probationers observe the terms of their probation and do not commit any further crimes.  U.S. v. Knights, 534 U.S. 112, 117 (2001).  It is well established probationers have a substantially diminished expectation of privacy.  Griffin v. Wisconsin, 483 U.S. 868, 874 (1987).  This lower expectation of privacy may be reduced further by agreement.  U.S. v. Graham, 553 F.3d 6, 15-16 (1st Cir. 2013).

Louisiana Code of Criminal Procedure Article 895 requires, among other things, that when a court places a defendant on probation that it *shall* require that the defendant refrain from criminal activity and pay a supervision fee [section A].  The article goes on to state that the court *may* impose any specific condition reasonably related to a probationer's rehabilitation, including reporting at the end of each month [A(1)], and permitting the probation officer to visit him at his home or elsewhere [A(4)].  The Article, which is not a model of clarity, also states that

> the defendant shall: ... (13)(a) Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer or the parole officer assigned to him, with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on probation is engaged in or has been engaged in criminal activity.

Art. 895(A)(13)(a).   The Article further requires that the defendant be given a certificate setting forth the conditions of his probation and that he "shall be required to agree in writing to the conditions."   Art. 895(J).

Samuels signed a form whereby he acknowledged his conditions of probation.   Ex. G-1.   That form specifically authorizes a home visit.   It does not, however, specifically authorize a warrantless search of the house based on reasonable suspicion.   Apparently, the form used in Caddo Parish at that time, at least in misdemeanor probation cases, was not updated following the addition of Subsection A(13)(a) that permitted residence searches.

The absence of the condition on the form is not dispositive of this issue.   In U.S. v. Keith, 375 F.3d 346 (5th Cir. 2004), the Fifth Circuit upheld a search of a probationer based on reasonable suspicion even before the addition of Subsection A(13)(a).   The defendant tried to distinguish the search of his home from the searches in Knights and Griffin because, in those cases, there was a written condition or state statute that authorized the warrantless searches.   Both Judge Stagg and the Fifth Circuit were unpersuaded.   Numerous Louisiana cases had upheld warrantless searches of probationers' homes based on reasonable suspicion. Keith at 350.   Thus, a probationer in Louisiana "is just as aware of the decreased expectation of privacy that follows from probation as a probationer in a state with a Griffin-like regulation in place."   Id.

Howard testified that, in every case she handles, she tells her probationers that the provision in the form authorizing home visits includes the right to search their residences. Thus, Samuels was on notice that he was subject to home visits and searches of his residence.

Page 11 of  15

The fact that Samuels was on misdemeanor probation, and not felony probation, is not dispositive.  The Supreme Court has made no distinction between felony and misdemeanor probationers.  <u>U.S. v. Izatt</u>, 2010 WL 2867818 (D. Idaho).

Samuels signed the form acknowledging that he was subject to home visits. Reasonable suspicion is not required for a home visit.  <u>U.S. v. LeBlanc</u>, 490 F.3d 361, 368-369 (5th Cir. 2007).  In <u>LeBlanc</u>, the Fifth Circuit rejected the defendant's argument that the probation officer went too far when, after entering the defendant's residence, the officer asked to "look around" (and then saw a firearm in plain view).  According to the court: "LeBlanc, as a probationer with diminished expectations of privacy, cannot expect that a probation officer will not view the various rooms in his home while conducting a home visit to verify that his residence there is genuine and suitable."  The probation officer did not cross the line from a home visit to a search.

Brown and Howard had reasonable suspicion that Samuels was engaged in criminal conduct while on probation.  Therefore, both the home visit and search of Samuel's residence were conducted pursuant to Louisiana law and were constitutional.  The fact that Howard had never conducted a home visit before or that Brown – the more experienced officer – took over once contact was made with Samuels inside the residence does change the result.

Even if <u>Griffin</u>, <u>Knights</u>, <u>Keith</u>, and Art. 895(A)(13)(a) are not considered, there is another, independent basis to uphold the searches and seizures inside the residence.  The discovery of the firearms and other contraband were the result of consensual searches authorized by both Samuels and Taglieri.  Initially, and as explained above, the officers were

entitled to enter Samuel's residence based on the home visit condition of his probation. Taglieri did not object to their entry; in fact, the credible evidence established that the officers knocked on the door and Taglieri voluntarily let them in after learning their identities and purpose.  When Samuels entered the kitchen area (after Taglieri called out his name), Brown properly patted him down for officer safety based on reasonable suspicion that he was in possession of a weapon and had recently engaged in home invasions.

After Brown discovered drugs in Samuels' pocket, it was completely reasonable for Brown to request consent to search the residence.  Both Samuels and Taglieri freely and voluntarily consented to a search.  There was no intimidation, duress, force, or pressure of any kind used to obtain their consent.  Indeed, after Samuels gave Brown consent for him to go look for the gun, and the gun was found, Samuels once again gave Brown oral consent to search for other items of contraband.  And Taglieri signed two consent to search forms. Both were cooperative with the officers throughout the encounter.

After considering all of the relevant factors, U.S. v. Rivas, 99 F.3d 170, 175-176 (5th Cir. 1996), the undersigned finds that both Samuels and Taglieri freely and voluntarily consented to the searches of their residence during a proper probation home visit.  Therefore, the searches were proper, and none of the evidence obtained or statements made following entry into the residence should be suppressed.

**Motion to Reopen Evidence**

Following the filing of supplemental briefs, the Government moved to reopen the evidence to present court minutes from Caddo Parish purporting to reflect that Samuels

agreed that the conditions of his probation included all of the provisions of Art. 895.  That request should be denied.  There is no reason that information was not available to the Government for presentation at the hearing on the motion to suppress.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 19) be denied.

**IT IS FURTHER RECOMMENDED** that the Government's Motion to Reopen the Evidence (Doc. 31) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **seven (7) days** from the filing of the objections.  Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 15th day of September, 2014.

Mark L. Hornsby
U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA            CRIMINAL NO. 14-cr-00042-01

VERSUS                              JUDGE STAGG

DONZELL JOSEPH SAMUELS, JR.         MAGISTRATE JUDGE HORNSBY

### REPORT AND RECOMMENDATION

**Introduction**

Before the court is Defendant's **Motion to Suppress (Doc. 19)**.  An evidentiary hearing was held on July 14, 2014.  For the reasons that follow, it is recommended that Defendant's motion be **denied**.

**Facts**

The testimony at the hearing establishes the following facts.  ATF Task Force Agent Jeffrey Brown received information from a reliable source that "Cowboy," who resided at 6543 West Canal in Shreveport, was in possession of a firearm and "POLICE" T-shirts, and he was involved in home invasions and other illegal activities. Tr. 6. The source confirmed to Brown that Cowboy had previously resided in the Queensborough neighborhood on Catherine Street and that Cowboy's mother still lived on Catherine Street. Tr. 6.

Brown has 16 years of law enforcement experience as a commissioned Shreveport Police Officer.  He has a federal ATF law enforcement commission and also is commissioned a Caddo Parish Sheriff's Deputy.  He knew that Defendant, Donzell Joseph Samuels, Jr.,

used the alias "Cowboy" and had lived on Catherine Street.  He also knew that Samuels had at least one prior felony conviction. Brown later confirmed that Samuels had three felony convictions in the First Judicial District Court in Caddo Parish: one for burglary of an inhabited dwelling; another for possession of a Schedule II controlled dangerous substance; and a third for accessory after the fact to manslaughter.  Tr. 6-7.

Brown contacted Caddo Sheriff's Deputy Kameelah Howard of the Caddo Parish Sheriff's Office Probation Department.  Howard has been a deputy for seven years and worked in the Sheriff's Department misdemeanor probation office for approximately two years. Howard told Brown that Samuels was on misdemeanor probation.  Howard confirmed that Samuels' residential address was 6543 West Canal in Shreveport; that was the address Samuels gave to Howard and that was on a signed probation department document. Ex. G-1; Tr. 63.

Brown told Howard that he had received information that Samuels possessed a firearm and other items at his residence on West Canal and had been involved in home invasions. Howard told Brown that the probation office had not made personal contact with Samuels at his residence since he was placed on probation, but she would check with her supervisors. She did, and her supervisor instructed her to conduct a home visit.  Tr. 65-67.  Howard then contacted Brown and told him she planned to "go out and check," and she asked Brown to accompany her and the other officers to assist in the event any firearms were found.  Tr. 66. Howard had never conducted a home visit before and was not sure what to do if firearms were found.  CPSO Sgt. Mike Middleton also assisted.  Tr. 66-67.

The plan was to determine if Samuels was home, then make contact with him.  Tr. 67.
Brown drove by 6543 West Canal and saw Samuels outside the residence. It appeared that
Samuels entered the residence through a side door.  Tr. 10-11.  Howard was so advised.  A
few minutes later, Howard, Middleton, and several other deputies from the probation office,
approached the residence.  There were two entrances.  Some deputies went to the front door.
Howard, Middleton, and another deputy went to the side or kitchen door.  The deputies were
dressed in Sheriff's Department uniforms.  Howard was a wearing protective vest under her
uniform shirt.  Middleton wore one over his uniform, but it was well marked.  No weapons
were drawn, and no force was used at any time.

Howard knocked on the building at the side door to the kitchen , which had a screen
door with decorative metal burglar bars on it. Ex. 6A.  The solid door behind the screen door
opened and the deputies were greeted by Zeshauntel Taglieri, who resided at the residence
and was then believed to be Samuels' girlfriend.  Tr. 69. It was later determined that she was
Samuels' wife.

Through the screen door, Howard told Taglieri who she was and that she was there
to check on Donzell.  Taglieri hollered to the back, "Cowboy, your probation officer is here."
Samuels replied, "I'm coming," Tr. 71.  Howard testified, "And that's when we asked if we
could come in and she said yes, and we opened the door and stepped into the threshold just
right into the door." Tr. 70.

Middleton's testimony about entry into the residence was somewhat inconsistent with
Howard's testimony.  Middleton said Taglieri opened the door and left it open as she called

for "Cowboy," and when Middleton heard "Cowboy" coming from the back of the house, he moved to a tactical position for officer safety.  Tr. 109.  Middleton also said that he didn't remember specifically what Taglieri said about entering the house.  Tr. 110.  He stated that he probably asked Taglieri to open the screen/wrought iron door since he could not see her.  Tr. 120-121.  He stated that she cooperated and allowed entry.

Samuels came out of a room at the end of the hall and walked up the hallway into the living room area.  When Samuels saw Howard (a female), Samuels said, "I need to put on some clothes," because he was not wearing pants.  Tr. 71 and 108-110.  For officer safety, Middleton then walked with Samuels back to the second bedroom to the right so Samuels could get dressed.  Tr. 71.

The door to the bedroom had a hook that said "Cowboy" on it.  Howard remained in the kitchen area while Middleton accompanied Samuels to the bedroom.  After Samuels put on pants, Howard went back to the bedroom.  Samuels was looking through some drawers for a T-shirt to put on, but then said he didn't need a shirt.  Then Samuels, Howard, and Middleton walked to the kitchen and living area.  Tr. 72-73.  No search was made at this time. Tr. 71-72.

When Samuels came into the front kitchen and living area, Howard told Samuels she and the deputies were present for a probation visit because Howard had learned that he had a gun in the home.  Samuels said he did not have a gun.  Tr. 73.  At about this time, Brown arrived and patted down Samuels for officer safety.  Tr. 73.   Brown felt and heard plastic packaging in Samuels' pocket that Brown immediately recognized to be packaging for drugs.

When asked about this, Samuels replied that it was a little weed. (He called it his "high package".) Tr. 109. This baggie was removed from Samuels' pocket and placed on the table. It was found to contain marijuana and powder cocaine.  Samuels was then arrested, advised of his *Miranda* rights, and handcuffed.   Howard testified that Samuels appeared to understand his rights and waived those rights to answer Brown's questions. Tr. 16-17, 73-74.

Brown asked Samuels if there was a gun in the home.  Samuels replied that his girlfriend might have one in the back of the house.  Tr. 16 and Tr. 74.  Brown then asked Samuels where the gun was and if he could retrieve it.  Samuels stated that he did not know where the gun was.  Tr. 19-20.  When asked if there was anything else in the house such as firearms or narcotics, Samuels responded that there was not.  Tr. 21 and 22.  Brown asked Samuels if he could search for it and Samuels said, "Go Ahead."  Tr. 22.

Brown then asked Taglieri (as it turns out, the house was in her name) if the deputies could search the house.  She said, "Yes," and then Middleton produced a Sheriff's Department consent to search form.  Howard read the consent form to Taglieri, who signed the consent form.  Ex. G-2; Tr. 18, 75-77.

As Taglieri completed and signed the form, Brown asked her if there were any firearms inside the residence.  Taglieri asked Brown what Samuels had said about that. Brown replied that Samuels said that she had a firearm in the residence.  Taglieri stated she did not own a firearm, but that Samuels kept a silver one under the mattress.  Tr. 23-24. Brown entered the residence again, walked into the southwest bedroom where Samuels had exited when the deputies arrived, lifted the mattress and located a loaded silver .380 Colt

pistol.  Brown went back to the kitchen and told Samuels that he had found the pistol.  Brown asked Samuels if there was anything else in the residence that police should know about. Samuels said there was not.  Brown then asked Samuels if the police could search the house. Samuels again stated, "Go ahead."   Samuels told Brown that Brown had already found whatever he was going to find (referring to the .380).  Tr. 24-25.

Brown found a letter in the bedroom addressed to Samuels at that address.  Also found in the bedroom were a duffle bag containing digital scales, drug packaging material for distribution, a firearm, and assorted firearm ammunition. Tr. 26-27.   Two backpacks containing duct tape, rubber gloves, binoculars, a green "Incredible Hulk" face mask, two black T-shirts with "POLICE" printed on them in large white letters, and ear plugs were located in the closet of the southeast bedroom.  Tr. 27-28.  One of the backpacks contained the Louisiana driver's license of a male and a female who lived on a nearby street. Brown recognized the names of the people as victims of a home invasion robbery months earlier. Tr. 28.

Brown contacted a detective with the Shreveport Police Department's Armed Robbery Unit who recalled the home invasion and that one of the suspects was wearing a green mask. Brown told the detective that one of the backpacks contained a green "Incredible Hulk" mask along with the victims' driver's licenses.

Officers also found a locked safe in a hallway closet.  Several holes were in the bottom of the safe, which was designed to be bolted to a surface for security.  By looking

through these holes, Brown saw at least one handgun inside the safe.  The safe was seized, and a state search warrant was obtained to open and search it.  Tr. 29-30; Ex. G-5.

The safe contained a Smith & Wesson revolver, Model 66, caliber .357, loaded with six rounds of .357 ammunition in the cylinder; a Taurus pistol, Model PT809, caliber 9mm with nineteen (19) rounds of 9mm ammunition in the magazine and the chamber; a Ruger pistol, Model P95, caliber 9mm with fifteen (15) rounds of 9mm ammunition in the magazine and chamber; sixteen rounds of 9mm ammunition in an extended 9mm magazine; thirty-three rounds of .22 caliber ammunition; one round of .380 ammunition; and one round of 9mm ammunition.

Samuels was told that he was being arrested for possession of a firearm by a convicted felon and illegal carrying of weapons since he was also in possession of drugs.  Samuels said that he had a cocaine problem for a long time.  When asked about the .380 found under the mattress, Samuels admitted that it was his, but he said he did not do anything with it.  Tr. 31-32.  Samuels stated that he knew he could get ten years for it, so he asked that it not be a federal case.  Brown told him that this case would be an ATF case.  Samuels was then transported to Caddo Correctional Center for booking on various state charges and violation of his probation.  Tr. 32-34.

After Samuels was removed from the house, Brown asked Taglieri for her consent to search the areas of the house that had not yet been searched.   Taglieri orally consented and signed a second consent to search form.  Ex. G-3; Tr. 34-36.  Taglieri said that if anything else was found, she did not know about it.  In the hallway, Brown saw a pull down attic door

with a string attached.  He pulled the attic stairs down and walked up the steps into the attic.

At the top of the stairs, he found a 16-gauge shotgun and a police scanner.  In the kitchen

cabinets, Brown found a large plastic bag that contained a magazine for a shotgun, boxes of

ammunition, and a digital scale.  All items were photographed and seized.  Ex. G-4; Tr. 37-

38.

Brown asked Taglieri about her knowledge of the items found during the search.

Taglieri stated that she had been dating Samuels for some time; they had lived at the

residence for four months; Samuels had a cocaine problem and did not work; she worked to

pay the bills while he sat home and had his friends over to "do whatever it is that they do."

She said that she was unaware of the items in the closet and in the attic. She knew Samuels

had the one gun that was located under the mattress because Samuels carried it with him.

She knew the safe was in the closet, but he never told her what was in it or why it was there.

She said that she did not have access to the safe as far as having the code or a key to it.  Tr.

38-39.

When Samuels was placed on probation on June 26, 2013, he met with Howard to

review the conditions of his probation and to sign the Sheriff's Department conditions of

probation form.  Ex. G-1; Tr. 62-63.  On that document were Samuels' fingerprints, his

signature and written conditions of probation.   Tr. 63-64.   Howard testified that she

personally reviewed this form with Samuels to confirm that the information Samuels gave

was correct and that Samuels understood his conditions of probation.  Tr. 64.  The conditions

listed on the form included that Samuels refrain from criminal conduct, specifically the violation of any state, federal, local or municipal law.  Other conditions were that he refrain from owning or possessing firearms or other dangerous weapons, that he was subject to arrest with or without a warrant for the purpose of returning him to court, and that he permits the Probation Officer to visit him at home or elsewhere.

Howard also testified that, in addition to the written conditions on the form, she told Samuels that he was subject to other conditions that she called Article 895 conditions. She testified that she orally informed Samuels of those conditions.  Howard testified that she personally told Samuels of the condition in section (A)(13)(a) of Article 895 that by signing the form he was consenting to his probation officer's ability to search his home as a condition of probation.  Howard testified that went over that issue with Samuels and that she did so with all of the people under her supervision.  Tr. 101.  She further testified that when she talked about Condition 4 on the form which was "Permit the probation officer to visit your home or elsewhere," she told Samuels specifically that it was more than just a visit, it was to visit and search.  Tr. 102.  Samuels signed the form acknowledging he understood and agreed to the conditions. Tr. 62-63, 101-102.

**Defendant's Motion to Suppress**

Samuels argues that Brown's entry into his residence – after enlisting the aid of a probation officer – was unconstitutional as it was done as a subterfuge for the purpose of furthering a criminal investigation.  Samuels notes that the probation form that he signed contained a provision whereby he agreed to "home visits" by his probation officer, but not

a warrantless search of his person or residence.  Samuels also argues that any consent (from him or Taglieri) or any of his statements that may have been obtained or made after the officers entered the residence was not free and voluntary, but is "fruit of the poisonous tree."

**Law and Analysis**

States have a reasonable interest in ensuring that probationers observe the terms of their probation and do not commit any further crimes.  U.S. v. Knights, 534 U.S. 112, 117 (2001).  It is well established probationers have a substantially diminished expectation of privacy.  Griffin v. Wisconsin, 483 U.S. 868, 874 (1987).  This lower expectation of privacy may be reduced further by agreement.  U.S. v. Graham, 553 F.3d 6, 15-16 (1st Cir. 2013).

Louisiana Code of Criminal Procedure Article 895 requires, among other things, that when a court places a defendant on probation that it *shall* require that the defendant refrain from criminal activity and pay a supervision fee [section A].  The article goes on to state that the court *may* impose any specific condition reasonably related to a probationer's rehabilitation, including reporting at the end of each month [A(1)], and permitting the probation officer to visit him at his home or elsewhere [A(4)].  The Article, which is not a model of clarity, also states that

> the defendant shall: ... (13)(a) Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer or the parole officer assigned to him, with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on probation is engaged in or has been engaged in criminal activity.

Art. 895(A)(13)(a).  The Article further requires that the defendant be given a certificate setting forth the conditions of his probation and that he "shall be required to agree in writing to the conditions."  Art. 895(J).

Samuels signed a form whereby he acknowledged his conditions of probation.  Ex. G-1.  That form specifically authorizes a home visit.  It does not, however, specifically authorize a warrantless search of the house based on reasonable suspicion.  Apparently, the form used in Caddo Parish at that time, at least in misdemeanor probation cases, was not updated following the addition of Subsection A(13)(a) that permitted residence searches.

The absence of the condition on the form is not dispositive of this issue.  In U.S. v. Keith, 375 F.3d 346 (5th Cir. 2004), the Fifth Circuit upheld a search of a probationer based on reasonable suspicion even before the addition of Subsection A(13)(a).  The defendant tried to distinguish the search of his home from the searches in Knights and Griffin because, in those cases, there was a written condition or state statute that authorized the warrantless searches.  Both Judge Stagg and the Fifth Circuit were unpersuaded.  Numerous Louisiana cases had upheld warrantless searches of probationers' homes based on reasonable suspicion. Keith at 350.  Thus, a probationer in Louisiana "is just as aware of the decreased expectation of privacy that follows from probation as a probationer in a state with a Griffin-like regulation in place."  Id.

Howard testified that, in every case she handles, she tells her probationers that the provision in the form authorizing home visits includes the right to search their residences. Thus, Samuels was on notice that he was subject to home visits and searches of his residence.

Page 11 of  15

The fact that Samuels was on misdemeanor probation, and not felony probation, is not dispositive.  The Supreme Court has made no distinction between felony and misdemeanor probationers.  U.S. v. Izatt, 2010 WL 2867818 (D. Idaho).

Samuels signed the form acknowledging that he was subject to home visits.  Reasonable suspicion is not required for a home visit.  U.S. v. LeBlanc, 490 F.3d 361, 368-369 (5th Cir. 2007).  In LeBlanc, the Fifth Circuit rejected the defendant's argument that the probation officer went too far when, after entering the defendant's residence, the officer asked to "look around" (and then saw a firearm in plain view).  According to the court: "LeBlanc, as a probationer with diminished expectations of privacy, cannot expect that a probation officer will not view the various rooms in his home while conducting a home visit to verify that his residence there is genuine and suitable."  The probation officer did not cross the line from a home visit to a search.

Brown and Howard had reasonable suspicion that Samuels was engaged in criminal conduct while on probation.  Therefore, both the home visit and search of Samuel's residence were conducted pursuant to Louisiana law and were constitutional.  The fact that Howard had never conducted a home visit before or that Brown – the more experienced officer – took over once contact was made with Samuels inside the residence does change the result.

Even if Griffin, Knights, Keith, and Art. 895(A)(13)(a) are not considered, there is another, independent basis to uphold the searches and seizures inside the residence.  The discovery of the firearms and other contraband were the result of consensual searches authorized by both Samuels and Taglieri.  Initially, and as explained above, the officers were

Page 12 of  15

entitled to enter Samuel's residence based on the home visit condition of his probation. Taglieri did not object to their entry; in fact, the credible evidence established that the officers knocked on the door and Taglieri voluntarily let them in after learning their identities and purpose.  When Samuels entered the kitchen area (after Taglieri called out his name), Brown properly patted him down for officer safety based on reasonable suspicion that he was in possession of a weapon and had recently engaged in home invasions.

After Brown discovered drugs in Samuels' pocket, it was completely reasonable for Brown to request consent to search the residence.  Both Samuels and Taglieri freely and voluntarily consented to a search.  There was no intimidation, duress, force, or pressure of any kind used to obtain their consent.  Indeed, after Samuels gave Brown consent for him to go look for the gun, and the gun was found, Samuels once again gave Brown oral consent to search for other items of contraband.  And Taglieri signed two consent to search forms. Both were cooperative with the officers throughout the encounter.

After considering all of the relevant factors, U.S. v. Rivas, 99 F.3d 170, 175-176 (5th Cir. 1996), the undersigned finds that both Samuels and Taglieri freely and voluntarily consented to the searches of their residence during a proper probation home visit.  Therefore, the searches were proper, and none of the evidence obtained or statements made following entry into the residence should be suppressed.

**Motion to Reopen Evidence**

Following the filing of supplemental briefs, the Government moved to reopen the evidence to present court minutes from Caddo Parish purporting to reflect that Samuels

Page 13 of  15

agreed that the conditions of his probation included all of the provisions of Art. 895.  That request should be denied.  There is no reason that information was not available to the Government for presentation at the hearing on the motion to suppress.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 19) be denied.

**IT IS FURTHER RECOMMENDED** that the Government's Motion to Reopen the Evidence (Doc. 31) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **seven (7) days** from the filing of the objections.  Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

Page 14 of  15

THUS DONE AND SIGNED at Shreveport, Louisiana, this 15th day of September, 2014.

Mark L. Hornsby
U.S. Magistrate Judge